## Kayser v. Pennsylvania Railroad Company.

*Practice—New trial—Verdict—Excessive—Personal injuries.*

1. A verdict of $15,000 is not so excessive as to require granting a new trial, where plaintiff's injuries were serious and painful, resulting in the loss of the use of his right arm, with an even chance of regaining about 80 per cent. of its normal use by an operation. and he had lost over $1000 in earnings up to the time of trial, and, if the operation were successfully performed, there would be a further period of recuperation, with loss of earnings amounting to about $5000, with a substantial permanent diminution of earning power thereafter.

*Railroad police—Negligence—Liability of employers—Act in course of employment.*

2. A railroad is liable for the negligence of a member of its railroad police commissioned by the Governor under the Acts of May 24, 1878, P. L. 125, and June 11, 1879, P. L. 152, where plaintiff was shot by the officer while the latter was endeavoring to arrest a third person and rescue goods belonging to the company.

3. The officer, while making such arrest and endeavoring to rescue stolen goods, was acting in his employment and in the furtherance of the business and interests of his employer.

Trespass for personal injuries.   C. P. No. 2, Phila. Co., Dec. T., 1927, No. 11537.

*Robert M. Bernstein*, for plaintiff;  *Francis B. Biddle*, for defendant.

GORDON, JR., J., July 23, 1928.—This is an action in trespass to recover damages for injuries resulting from the alleged negligent shooting of the plaintiff by an officer employed by the defendant company as a member of its railroad police force and commissioned by the Governor as a special officer, under the Act of May 24, 1878, P. L. 125, and the Act of June 11, 1879, P. L. 152. The case was tried, by agreement of the parties, by a judge without a jury, who rendered a verdict in favor of the plaintiff for $15,000. The defendant then filed the rule for a new trial and motion for judgment *non obstante veredicto*, which are now before us for consideration.

The rule for a new trial is based principally upon the contention that the verdict is excessive. In view of the injuries received by the plaintiff, however, we deem the verdict proper and are of opinion that the rule should be discharged. There is very little disagreement between the physicians on each side respecting the injuries that the plaintiff suffered. He was shot in the neck, the bullet entering the front of the lower part of the neck on the right side and severing, or doing extensive damage to, the nerves controlling the right upper arm. The result of this injury is that the plaintiff has lost almost the entire use of his arm, according to the doctors, the function of the arm being about 85 per cent. destroyed. The shooting occurred on Dec. 3, 1927, and since that date the plaintiff has been unable to do any work at his usual occupation of trucker, at which he earned from $30 to $32 a week, in addition to which he was earning at this time from $15 to $24 a week in a side line of picking glass from a dump and selling it. This makes his loss of earnings to the date of the trial about $1040. As to the future, the prognosis is poor. There is no hope of a complete restitution of the arm to its normal function, but an operation can be performed with the object of possibly improving its condition. The chances between success and failure of such an operation are described by the doctors as "50-50," and if successful, the improvement would be only partial, that is, about 80 per cent. of the normal use. In any event, it is conceded that the patient could do no work for a year and a half or two years after the operation. This discloses an injury of a most serious and permanent character, accompanied by a certain total loss of earnings, includ-

ing the period of recuperation from the operation, amounting to about $5500 and a permanent and substantial diminution of earning power thereafter. The plaintiff is thirty-one years old and, as already stated, was earning about $52 a week. Considering these facts and making a proper allowance for pain and suffering and physical crippling, we do not deem $15,000 unconscionable or excessive for such an injury.

The motion for judgment *non obstante veredicto* is based upon the contention that the defendant's agent was not engaged upon its business when he shot the plaintiff, but with this contention we cannot agree. The facts, in our judgment, clearly show him to have been acting within the scope of his employment at the time. About three days before the shooting occurred, a freight car on the defendant's lines had been broken open and some property stolen. The theft was committed by a number of young boys, some of whom were captured by the defendant's officers. One of those taken confessed and named the leader of the gang responsible for the theft. The capture of the boys had resulted in the defendant regaining some, but not all, of the loot. On the day of the shooting, the defendant's officer, Charles Braun, was out, with the boy who had confessed, searching for the leader of the gang, who was still at large, to apprehend him and to recover the rest of the stolen property if possible. He was tracked to a garage in the northeastern section of the city, which was located near a large public dump. He fled from the garage and across the dump, pursued by the officer. Just at this time, the plaintiff, who had been stooping over picking glass on the dump, heard the officer fire his revolver and noticed the fugitive pass within about twenty feet of him. The plaintiff then stood up and waved to the officer in an effort to warn him not to shoot. The officer immediately fired again in the direction of the fugitive, and the bullet struck the plaintiff in the neck.

The officer explained the shooting by testifying that he was shooting at the ground in the general direction of the fleeing man when the plaintiff suddenly arose out of a hollow in the dump just as he fired the last shot and too late to hold his fire. The plaintiff, on the other hand, contended that he was at all times, whether when stooping or after he had arisen, in plain sight of the officer, who could and should have seen him. The trial judge, after an inspection of the scene of the accident, has found in favor of the plaintiff's contention, thus establishing the negligence of the officer. Even if we were inclined to do so, we could not disturb the trial judge's finding in that regard, supported, as it is, by abundant evidence. Indeed, at the argument, the defendant itself did not dispute that the plaintiff's injury was caused by the negligence of its officer.

Under these facts and the decisions applicable to them, it seems clear to us that the officer was acting within the apparent scope of his employment by the defendant when he was attempting to arrest the fugitive, and that the defendant is, therefore, responsible for the negligence of its agent.

The underlying doctrine of *respondeat superior* which governs cases of this general character is well settled in this Commonwealth, and a host of decisions might be cited in which it is pronounced in clear and unmistakable language. The case of Brennan v. Merchant & Co., Inc., 205 Pa. 258, adequately states the doctrine, by quotation from Rounds v. Delaware, etc., R. R. Co., 64 N. Y. 129, in the following language: " 'It is in general sufficient to make the master responsible that he give to the servant an authority, or made it his duty, to act in respect to the business in which he was engaged when the wrong was committed and that the act complained of was done in the course of his employment. The master in that case will be deemed to have

consented to and authorized the act of the servant, and he will not be excused from liability, although the servant abused his authority, or was reckless in the performance of his duty, or inflicted an unnecessary injury in excess of his master's orders. The master who puts the servant in a place of trust or responsibility and commits to him the management of his business or the care of his property is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and, the-occasion, goes beyond the strict line of his duty or authority and inflicts an unjustifiable injury upon another.' Whether the negligent act was within the scope of the servant's employment is a question of fact for the jury: Guinney *v.* Hand, 153 Pa. 404."

Clear as this statement of the doctrine is, its application to particular cases is difficult and has given rise to a number of apparently conflicting decisions. A careful inspection of the facts of each case, however, will disclose that they are in general harmony with the principle and that they can, in the main, be reconciled with each other. Thus it has been held that a conductor of a railroad company who improperly ejects a passenger is acting within the scope of his authority and his unlawful conduct renders his principal liable: McFarlan *v.* Pennsylvania R. R. Co., 199 Pa. 408. On the other hand, it has been held that the act of the starter of a trolley company stationed at a particular point in the line, who, within the scope of his authority, interferes with a passenger attempting to board a car of the company out of turn, and then drags him from the car, assaults and then prosecutes him, does not render the company liable for malicious prosecution, because the arrest and prosecution were not within the implied authority of the conductor: Riddell *v.* Philadelphia Rapid Transit Co., 80 Pa. Superior Ct. 176.

Without reviewing the vast number of cases upon this subject, it may be pointed out that they seem to fall into one or the other of two classes, namely, those involving the acts of employees generally, in which the tendency appears to be to confine the liability of the employer to instances in which the employees' acts were either expressly authorized or clearly within their implied authority, and those in which are involved the acts of special officers of railroad and similar companies. In the latter class of cases a body of decisions has arisen in which a special rule appears to have been laid down, although the general doctrine of *respondeat superior,* cited above, is the governing principle upon which all such cases turn. This rule has arisen by reason of the fact that special officers of railroad companies receive their commissions, under the Act of Feb. 27, 1865, P. L. 225, from the Governor of the Commonwealth, and are vested with all the powers of policemen of the City of Philadelphia. Because of this, it was held, in Finfrock *v.* North. Central R. R. Co., 58 Pa. Superior Ct. 52, that such a policeman "presumptively acts as a public officer, and not as the servant or employee of the railroad company." The case was reversed because of an improper submission to the jury of the company's liability for an incidental assault by the officer when the arrest was made, but on the question under discussion the court said: "It is true, he may be both, as was Geiselman, and in such a case a different question may arise. But at present we are speaking of a commissioned policeman who is not, in addition, an employee or servant of the company. Confining consideration strictly to that kind of case, our conclusion is that the question above propounded must be answered in the negative. This conclusion is in accord with the great weight of authority in other jurisdictions, and there is sufficient similarity between the statutes there construed and ours to give the decisions persuasive force. Amongst these are: Healey *v.* Lothrop, 171 Mass.

263; Tolchester Beach Imp. Co. *v.* Steinmeier, 72 Md. 313, 8 L. R. A. 846; Tucker *v.* Erie Ry. Co., 69 N. J. Law, 19; McKain *v.* B. & O. R. R. Co., 65 W. Va. 233, 23 L. R. A. (N. S.) 289. The peculiar pertinency of Tucker *v.* Erie Railroad Company will be shown by the following excerpt from the opinion: 'It is plain from a reading of the provisions of this statute that although these men were appointed on the application of the defendant company, received their compensation from it and were subject to be divested of their powers by its act, they were, nevertheless, state officers charged with the performance of public duties. They were, in law, police officers, constables, authorized to arrest persons guilty of criminal offenses or breaches of the peace, not only in cases where the property of the company was involved, but in every case where the crime was committed or the peace broken within the boundaries of any of the counties through which the company's railroad ran. For the proper discharge of their official duties, as well as for the proper exercise of their official powers, they were responsible, not to the defendant company, but to the state. . . . In order, therefore, to render the defendant company legally responsible for the unwarranted arrest made by them and the subsequent criminal prosecution maliciously instituted by Dwyer, it was necessary to show that their action was instigated by the company or by some of its officers or employees; that what they did was done by them as agents of the company and not solely of their own volition as police officers.' "

This *prima facie* presumption, it was pointed out, however, may be overcome by evidence warranting a finding that the officer "was at the time engaged in special service for the company, such as guarding its property or enforcing obedience to its rules. If, in such case, it appears that the wrongful act was within the scope of such special service or employment, the fact that he also held a commission from the state will not bar recovery from the company. See, also, McKain *v.* B. & O. R. R. Co., 65 W. Va. 233; Higby *v.* Pennsylvania R. R. Co., 209 Pa. 452."

The case just reviewed and that of Naugle *v.* Pennsylvania R. R. Co., 83 Pa. Superior Ct. 528, are the two most strongly relied upon by the defendant in its argument upon the motion for judgment *non obstante veredicto.* In the latter case, Judge Gawthrop reviews at length the Finfrock decision and applies its principles to the facts of the case before him, with a resulting reversal of the verdict for the plaintiff and an entry of judgment, in the Superior Court, in favor of the defendant. The facts of the Naugle case, however, clearly required the entry of a non-suit in the court below. The police officer there illegally arrested the plaintiff, without a warrant, as a "suspicious person." The arrest was made upon a public street and was not directed or instigated by any officer or employee of the company, and the non-suit was entered because "the only testimony as to the powers and duties of the officers was their own. Each of them testified that he was commissioned by the Governor and paid by the company. We look in vain for any evidence of actions by them which were not fairly within the scope of the duties of railroad policemen under the Act of 1865. Nor was there any evidence that they were employed to do any other work. How, then, can it be said that the presumption that they acted as public officers was overcome?"

It will be noted that in the Naugle case the arrest was not made upon the property of the defendant nor upon any charge which involved an offense committed to the injury of the defendant company, so that the officer could not be deemed to be acting for the protection of his employer's property or in the enforcement of its rules. In the case before us, however, there was ample

evidence to support the inference that Officer Braun was acting in the further-
ance of his master's interests and primarily for the benefit of his master. ·
An arrest upon the vague charge of being a "suspicious person" in no way
connected the defendant company with the subject-matter of the arrest and
furnished no evidence from which an inference could be drawn that it was
made for the benefit of the employer. Here, however, the attempted arrest
was of a known and wanted thief who was being sought by an officer of the
company for a crime committed against the company, and in an effort, in
addition, to locate and recover property of the company stolen by such thief.
This clearly indicates that the officer, in attempting to make the arrest, was
performing one of the very duties of his employment and was acting in
furtherance, primarily, of the business and interests of his employer. It
must not be forgotten that a crime had been committed against the company
which had thereby suffered a loss of property, and that in performing the
duties of his employment the officer whose negligence caused the injury to this
plaintiff was searching for a thief through whom he had fair reason to believe
his employer's property could be located and recovered. The consequences
that might have followed upon the failure of Officer Braun to endeavor to
arrest the thief are not controlling considerations, but they are suggestive
and illuminating in considering the question before us. The railroad com-
pany, of course, would not discharge one of its policemen who had failed to
arrest a "suspicious person" upon the highway; but it would be strange
indeed if such an officer were not instantly dismissed from his employment if
he should report to the company whose stolen goods it was his duty to recover
that, though he had searched for the thief and had found him, he had let this
possible source of recovery of his employer's property escape and should seek
to justify his action upon the ground that the company had employed him to
do no more than to protect its property while still in its possession. The
circumstances, therefore, take this case out of that line of cases represented
by the Naugle and Finfrock decisions and bring it, in our judgment, squarely
within the line illustrated by Higby v. Pennsylvania R. R. Co., supra, in
which all the facts and circumstances in evidence overcome the prima facie
presumption that a special officer in making an arrest is acting solely in his
capacity of police officer and not as agent of his employer.

Indeed, were it not for the controlling pronouncement of the court in the
Finfrock and similar cases that a special officer of a railroad presumptively
does not act on behalf of his employer, we would be inclined to adopt a con-
trary view. It seems to us that the clear purpose of the Act of 1865 was to
aid public service corporations, such as railroads, in the protection of their
property and the maintenance of order thereon by investing certain of their
employees with general police powers, and that such powers are not primarily
intended by that act to be conferred for general purposes of police regulation,
but only as very proper and necessary aids in the maintenance of law and
order on a class of property peculiarly open to general public resort, with the
consequent danger of general public injury and disorder. As stated in the
Finfrock case, the officer's commission, which is granted on the application of
the company, dies when he leaves its service; he is paid by the company and
his activities are almost exclusively confined to enforcing the criminal law in
the interests of his employer. These facts would seem logically to require us
to hold the prima facie presumption to be that such an officer is acting within
the scope of his employment and by authority of his master. However, the
contrary rule has been established by our higher courts, and we are not at
liberty to disregard it so long as it remains the law.

Kayser v. Pennsylvania Railroad Company.

In conclusion, it may be noted that, notwithstanding the *prima facie* rule referred to, most of the decisions have sustained verdicts rendered against companies employing special officers and that it has been only in clear cases in which the acts of the officers were obviously outside the scope of their employment that this rule has been allowed to prevail. Thus, recoveries were sustained in Higby v. Pennsylvania R. R. Co., 209 Pa. 452; McGinley v. Philadelphia & Reading R. R. Co., 257 Pa. 519; Dunn v. Philadelphia & Reading Ry. Co., 65 Pa. Superior Ct. 406; Geiger v. Madden, 58 Pa. Superior Ct. 616; Duggan v. B. & O. R. R. Co., 159 Pa. 248; McFarlan v. Pennsylvania R. R. Co., 199 Pa. 408; Dunne v. Pennsylvania R. R. Co., 249 Pa. 76, and Keidel v. B. & O. R. R. Co., 281 Pa. 289; while recoveries have been denied in Berryman v. Pennsylvania R. R. Co., 228 Pa. 621; Shay v. American Iron and Steel Co., 218 Pa. 172; Zimmerman v. Adams Express Co., 240 Pa. 316, and Bunting v. Pennsylvania R. R. Co., 284 Pa. 117.

We, therefore, conclude that, under the facts as shown by the evidence in this case, from which all inferences unfavorable to the plaintiff must be excluded in considering a motion for judgment *non obstante veredicto*, a nonsuit could not have been entered. The case was clearly for the jury and the trial judge was warranted in concluding that when the officer negligently fired the shot which injured the plaintiff he was acting within the scope of his employment and for the benefit of his employer and that the defendant is, therefore, responsible for his negligence.

Accordingly, the motion for judgment *non obstante veredicto* is overruled and the rule for a new trial is discharged.